NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0153n.06
Filed: February 26, 2007

No. 05-4456

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Mirash Stenaj; Stella Stenaj,

    Petitioners,

        v.                            On Review From The Board
                                       of Immigration Appeals

Alberto R. Gonzales, Attorney General

    Respondent.

_____/

**Before:**     **BOGGS, Chief Judge; COOK, Circuit Judge; and CARR, District Judge.**[*]

    **James G. Carr, District Judge.**     Petitioners Mirash and Stella Stenaj sought admission to the United States in May, 2000 under the Visa Waiver Pilot Program. After being denied admission, they filed an application for asylum, withholding of removal, and relief under the Convention Against Torture. On April 23, 2004, the Immigration Judge ("IJ") denied relief on all claims. The Board of Immigration Appeals ("BIA") later "affirm[ed] . . . the results of the [IJ's] decision." Petitioners brought this appeal to challenge the decision

_____

[*]The Honorable James G. Carr, Chief Judge of the United States District Court for the Northern District of Ohio, sitting by designation.

1

of the BIA, and by reference, the decision of the IJ. After review of the record and the arguments presented on appeal, we affirm the decision of the BIA.

## I

The following facts are derived from testimony and documents that the IJ generally found to be credible.

Mirash Stenaj was born in the town of Shkoder, Albania in 1979. He began participating with that country's Democratic Party in 1994 by distributing fliers and placards and performing other tasks at the age of fifteen. At that time, Mirash met Mark Lakai. Since the Democratic Party took control in Albania in 1992, Lakai had served as a Shkoder police chief fighting drug activity and corruption. Mirash became an official member of the Democratic Party in 1996, and shortly thereafter, Lakai introduced Mirash to Lakai's daughter, Stella.

The Socialist Party came to power in 1997 and Lakai, fearing retribution for his role in the police force, fled Shkoder, retreated "to the mountains," and went into hiding. Before fleeing, Lakai asked Mirash to look after his wife and daughter, Stella. Subsequently, Mirash moved into their residence.

Beginning just days after Lakai left and Mirash moved into the Lakai household, petitioners experienced a series of encounters with the police. Around midnight one night, a group of armed men dressed as policemen and identifying themselves as such knocked on their door and questioned Mirash about Lakai's whereabouts. Three of them entered the

house, interrogated Stella and her mother, and verbally assaulted them when no answers were forthcoming about Lakai. After searching the house and finding nothing, they left.

The police returned to the house several more times in the following year, questioning Mirash about Lakai's whereabouts, but receiving no answers. From approximately June of 1998 to September of 1999, the police did not show up at the Lakai household.

After Mirash married Stella in September of 1999, the police returned once more to the house after midnight. Armed police officers entered the house, pointed their guns at petitioners and told them not to move. Then the police searched "everything that was in the house," saying that they were searching for Mark Lakai. After searching the house, they "beat . . . up" Mirash and verbally assaulted Stella and her mother. Mirash did not receive medical treatment after the beating, ostensibly because he "didn't want to leave [Stella and her mother] alone."

After September of 1999, the police continued returning to the house looking for Mark Lakai. Petitioners also claim they received threatening letters underneath their door saying that petitioners would be arrested if they did not divulge Mark Lakai's location.

Around December of 1999, Mirash was also pulled over by the police while carrying around thirty passengers in a truck for his business. He was told to drive (with passengers in tow) to the police department. On reaching the police department, some officers grabbed Mirash by the ear, dragged him into the police building, interrogated him about Lakai's whereabouts, and started to "threaten and scare" him. After an hour inside the building,

3

Mirash's passengers began complaining and the police let him go. Mirash and Stella left the country around May of 2000.

Stella and her mother had been in sporadic telephone contact with Mark Lakai. After Mirash and Stella left Albania, Stella's mother left to live with family members about a twenty-minute drive outside of Shkoder. She has since been visited by police who stopped by her new residence to ask her about Mark Lakai's whereabouts. Petitioners claim they never attempted to move to another part of the country because "the Communists are all over Albania."

## II

Although he found their fear to be subjectively genuine, their testimony credible, and their documents predominantly trustworthy, the IJ held that the Stenajs' asylum claim failed for four reasons: 1) the Stenajs fear of persecution was not well-founded; 2) the Stenajs could have escaped harm by relocating elsewhere in Albania; 3) the Stenajs did not establish that the persecution they would purportedly face upon return was connected to some enumerated ground; and 4) petitioners were not eligible for humanitarian asylum. Petitioners challenge the IJ's ruling on each of these grounds.

The IJ found that the Stenajs did not have a well-founded fear of persecution upon return to Albania. First, the IJ found that the petitioners' experiences in Albania did not amount to past persecution (which, if it did, would have given rise to the rebuttable presumption that their fear of future persecution was well-founded). Second, the IJ held that

4

the two had failed to meet their burden of proving that future persecution was a "reasonable possibility" such that they would have a well-founded fear of persecution.

The IJ also held that petitioners did not make any serious effort to relocate inside Albania, which, according to the judge, "could very well have been a viable alternative" for them. The IJ implied that relocating to another town or region could prevent any persecution they claim to face upon return to Albania.

Finally, the IJ found that the persecution feared by the Stenajs was not on account of their "race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42)(A). Petitioners, according to the IJ, had not met their burden of showing that any future harm was tied to their political opinion or imputed political opinion. While the IJ implied that petitioners suffered harm because they were members of Mark Lakai's family, he did not hold that belonging to Lakai's family gave them protected status through "membership in a particular social group." The IJ therefore ruled that they had not met their burden of proving themselves to be refugees.

The IJ did not directly address whether petitioners qualified for humanitarian asylum, which is designed for those who have suffered particularly severe persecution in the past. However, as a grant of humanitarian asylum is necessarily predicated upon a finding of past persecution, we may assume that the IJ implicitly denied such claim.

After denying their application for asylum, the IJ also denied the Stenajs withholding of removal and any relief under the Convention Against Torture.

5

The IJ found, and the government does not appear to challenge, that due to Mirash's previously filed application, the Stenajs are entitled to apply for asylum. Mirash met the one-year time frame within which applications for asylum must be filed, and therefore his claims were analyzed under the "well-founded fear" standard instead of the more stringent standard for withholding of removal.

### III

When the BIA affirms the IJ's decision without opinion, a circuit court must consider the IJ's decision the final administrative order and review the IJ's factual findings under the substantial evidence standard of review. *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). The IJ's findings of fact are therefore "'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)). Questions of law are reviewed *de novo*. *Alexandrov v. Gonzales*, 442 F.3d 395, 404 (6th Cir. 2006).[1]

### A.    Asylum

#### 1.    Well-Founded Fear

A claimant must prove, in order to qualify as a refugee, that his fear of persecution in his home country is well-founded. Specifically, he must show that there is a "'reasonable

_____

[1]

The amount of deference to the IJ's statutory analysis, when affirmed by the BIA without opinion, has recently been addressed by other courts. *See Lin v. DOJ*, 416 F.3d 184, 191 (2d Cir. 2005) (finding that the IJ's statutory construction should not receive the *Chevron* deference normally afforded to the BIA); *Alvarado v. Gonzales*, 441 F.3d 750, 758-59 (9th Cir. 2005) ("*Chevron* deference does not apply to an IJ's statutory interpretation summarily affirmed by the BIA."). Since we do not disagree with any statutory interpretation by the IJ in the present case, we need not explore this particular issue of agency deference.

possibility'" of persecution upon his return. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987) (quoting *INS v. Stevic*, 467 U.S. 407, 425 (1984)); *Lumaj v. Gonzales*, 462 F.3d 574, 578 (6th Cir. 2006). The Sixth Circuit has interpreted the requirement of having a "well-founded fear" to include both a subjective and objective element. *Perkovic v. INS*, 33 F.3d 615, 620-21 (6th Cir. 1994) (interpreting *Cardoza-Fonseca*, 480 U.S. at 430-31, 440).[2] Not only must the claimant subjectively fear persecution, but the fear must be well-founded from an objective standpoint. *Perkovic*, 33 F.3d at 620-21.

In this case, the IJ has held that petitioners subjectively feared persecution, but that their fear was not objectively reasonable because there was not a "reasonable possibility" of persecution upon their return to Albania.

     **a.    Past Persecution**

The law presumes one's fear of persecution is well-founded if he has suffered past persecution in his country of origin. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir.1998) (citing 8 C.F.R. § 208.13(b)(1)(i)). Once the presumption is established, the government may rebut it by showing, *inter alia*, that relocation within the country of origin is a viable and reasonable alternative. 8 C.F.R. § 1208.13(b)(i)(B).

---

[2] In particular, *Cardoza-Fonseca* notes that the BIA's decision in *Matter of Acosta* found a subjective component to exist due to the use of the word, "fear." *Id.* at 431 n.11 (citing *Matter of Acosta*, Interim Decision No. 2986, at 14 (Mar. 1, 1985) (citing Webster's Third New International Dictionary 831 (16th ed. 1971))).

The term, "persecution" appears in the statute that sought to bring U.S. law in line with the 1967 Protocol Relating to the Status of Refugees, to which the United States acceded in 1968. Although some envisioned that the statutory amendments would not alter the country's then-existing obligations under United States law, *Stevic*, 467 U.S. at 417-418, it is also recognized that the United States has sought, through statutory amendment, to bring its domestic laws in line with its international commitments under the Protocol (to which it was a signatory). *Id.* at 417; *Percovic*, 33 F.3d at 621.

Although it helps define what a "refugee" is under our domestic laws, the term, "persecution" is not itself defined in the statute. *Mikhailevitch*, 146 F.3d at 389 ("The Act provides no definition of 'persecution.'"); *Woldemeskel v. INS*, 257 F.3d 1185, 1188 (10th Cir. 2001) (noting that "persecution is not explicitly defined"). Nor do the regulations elaborate upon the meaning of the term. *See Diallo v. Gonzales*, No. 05-9538, 2006 WL 1174624, at *2 (10th Cir.) ("persecution is not defined in the regulations"). The Sixth Circuit has looked to the Protocol, which the United States sought to implement through domestic legislation, in order to inform the definition of a "refugee." *See Perkovic*, 33 F.3d at 621 (citing *Cardoza-Fonseca*, 480 U.S. at 436-37) ("it is appropriate to refer to international law on the treatment of refugees in considering the meaning of the asylum provision").

The Sixth Circuit has held that "'persecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant

8

deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998). Physical harm, though more likely to qualify as persecution than non-physical harm, is not persecution *per se. See, e.g., Almuhtaseb v. Gonzales*, 453 F.3d 743, 750 (6th Cir. 2006) (being pushed to the ground, having chemical sprayed on face, and having rock thrown at oneself does not qualify as persecution). Conversely, not all persecution need involve physical harm. *See Ouda v. INS*, 324 F.3d 445, 453-54 (6th Cir. 2003) (finding that petitioners were persecuted when they were "unable to earn a livelihood or travel safely in public, forced to sell their belongings to buy food, and expelled"); *Kantoni v. Gonzales*, 461 F.3d 894, 897-98 (7th Cir. 2006) ("A credible threat that causes a person to abandon lawful political or religious associations or beliefs is persecution."). Whether the treatment feared by a claimant violates recognized standards of basic human rights can determine whether persecution exists. *Abay v. Ashcroft*, 368 F.3d 634, 638-39 (6th Cir. 2004); *James C. Hathaway*, *The Law of Refugee Status* 104-05 (1991) (defining persecution as the "sustained or systemic violation of basic human rights demonstrative of a failure of state protection"). Also, a collection of harmful events, even though they may not qualify individually as persecution, may taken together constitute persecution. *Cecaj v. Gonzales*, 440 F.3d 897, 899 (7th Cir. 2006) (stating that IJ improperly focused on "the significance of the episode [of violence] in itself" rather than "the entire sequence of experiences that [the claimant] underwent as a consequence of his political activity").

Petitioners have not proven that the harm they suffered amounts to persecution. Certainly, they were harassed in a variety of ways. They endured repeated visits to their home late at night, where armed officers held them momentarily and searched their dwelling. They were verbally abused. They received threats that they would be arrested. Mirash was brought into a police station and interrogated for an hour. Mirash suffered a beating of unspecified severity. As described, these events certainly intruded upon the freedom and privacy of petitioners, and no doubt left them feeling quite helpless, but they do not amount to persecution, even when assessed collectively. *See Mikhailevitch*, 146 F.3d at 390.

Petitioners cite *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005), arguing that the case presents an analogous situation where the claimant was found to suffer past persecution. Granted, petitioners share several facts in common with the claimant in *Gilaj*. Both the petitioners and the claimant in *Gilaj* were members of the Democratic Party in Albania around the same approximate time frame. *Id.* at 280-81. Both were subject to repeated searches of their homes. *Id.* Both cases involved at least some physical abuse and some detention. *Id.* But the claimant in *Gilaj* experienced mistreatment to a much greater degree. All we know is the basic fact that Mirash was "beat[en]" once, but Gilaj's husband was wounded in the neck with a knife. *Id.* While Mirash was detained for an hour, Gilaj was detained for two days without food, during which she was beaten. *Id.* Instead of receiving threats of arrest, Gilaj received death threats. *Id.* Finally, the claimant in *Gilaj* was molested by her persecutors. *Id.*

One important variable that goes largely unaddressed by petitioner is the beating suffered by Mirash. Petitioner never explains if his beating was serious or not. The government reminds us that the beating did not require medical treatment, but petitioners counter by arguing that Mirash did not seek treatment because he didn't want to leave his family alone and defenseless. Whatever the reason he failed to seek medical help, it is clear that Mirash completely failed to assert the severity of the physical harm he experienced.

Petitioners bore the burden of proving that their experiences amounted to persecution, and they have failed to present detailed facts supporting a conclusion that their treatment constituted persecution. *Rreshpja v. Gonzales*, 420 F.3d 551, 554-555 (6th Cir. 2005) (citing *Mikhailevitch*, 146 F.3d at 389) (noting that burden of proving past persecution falls upon applicant). As a result, we agree with the IJ that the Stenajs did not meet their burden of proving past persecution.

### b. Future Harm

A claimant who has not proven that he suffered past persecution can still prove that he has a well-founded fear of persecution in the future and thereby receive refugee status. *See* 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(a); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). By definition, such a person must prove that there is a reasonable possibility that the harm he faces upon return is greater than the harm he experienced in the past.

Citing both the petitioners' individual predicament as well as changes in country conditions, the IJ made a factual finding that there is no reasonable possibility that petitioners

11

would receive harsher treatment from authorities upon return than in the past. He noted that "[the police] had plenty of opportunity between 1997 and 2000 to arrest, detain, and harm the respondents if that indeed was their goal. They have chosen not to do so." The IJ mentioned that petitioners had several encounters with authorities, and that none of them involved mistreatment that amounts to persecution. Moreover, the IJ noted that recent changes in the structure of government in Albania make it less likely that those affiliated with the Democratic Party will be persecuted. Because the actions by the authorities do not show a trend toward more severe treatment, he reasoned, petitioners can expect at most the same unfortunate, yet not quite horrific, treatment upon their return.

Other fact-finders might have noted a slight increase in the severity with which petitioners were treated. For instance, while they were not harmed physically or detained prior to 1999, Mirash suffered both a physical beating and brief detention in late 1999. This might lead one to believe, for example, that there is a reasonable possibility that Mirash will be detained for a much greater period after his return.

Despite what alternative perspectives of the facts may portend, the IJ's findings of fact are entitled to deference. Since a "reasonable adjudicator" could agree with the IJ in this case, his position must stand on appeal. *Yu*, 364 F.3d at 702 (quoting 8 U.S.C. § 1252(b)(4)(B)).

2.      **The Relocation Alternative**

Regardless of whether the claimant makes a showing of past persecution, he must show that relocation within his country of origin would not prevent the harm he fears or is otherwise

12

unreasonable. 8 C.F.R. §§ 1208.13(b)(i)(B), 1208.13(b)(2)(ii). Since we affirm the IJ's decision on other grounds, we need not confront the issue of relocation at the present time.[3]

*Id.*

### 3.    **Nexus Between the Harm Feared and an Enumerated Ground**

In order to qualify as a refugee, the harm that the applicant fears must be "on account of" some enumerated ground, including "race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42)(A). One may qualify, for instance, if authorities impute a political opinion to a claimant. *Abdulnoor v. Ashcroft*, No. 03-3001, 2004 WL 1894731, at *1 (6th Cir.). Also, it may be possible for one's immediate family to constitute a "particular social group" in some instances. *Gonzales v. Thomas*, __ U.S. ___, 126 S.Ct. 1613, 1615 (2006) (remanding on the issue for agency determination); *Akhtar v. Gonzales*, 406 F.3d 399, 405-06 (6th Cir. 2005) (deciding not to find a family-based nexus on particular facts); *Toma v. Gonzales*, No. 04-4310, 2006 WL 1208075, at *4 (6th Cir.) (finding family-based nexus but denying asylum on other grounds).

---

[3] The IJ held that relocation within Albania "could very well have been a viable alternative" for them. We note parenthetically that the IJ's precise statement does not quite address the statutory standard for the relocation alternative. 8 C.F.R. § 1208.13(b)(2)(ii) (stating that the applicant does not have a well-founded fear of persecution if he "could avoid persecution by relocating to another part of the applicant's country of nationality . . . [and] under all the circumstances it would be reasonable to expect the applicant to do so"). Since a finding that relocation is infeasible is not necessary to the resolution of this case, however, we need not address this portion of the IJ's Order.

The IJ found that petitioners did not prove a nexus to an enumerated ground. Because the petitioners' application should be denied on other grounds, however, we neither approve nor reject the conclusion reached by the IJ regarding the required nexus.

### 4. Humanitarian Asylum

It is possible for a victim of past persecution to be granted asylum even when: 1) the government has rebutted the presumption that his fear is well-founded; and 2) the applicant does not have a well-founded fear of persecution independent of his past persecution. In such cases, the applicant may still receive asylum if the harm he suffered in the past is so severe that it would be inhumane to expect his return.

As noted by petitioners, humanitarian asylum has a basis in both the regulations and in case law interpreting the statute. *See* 8 C.F.R. § 1208.13(b)(1)(iii); *Matter of Chen*, 20 I. & N. Dec. 16, 21 (BIA 1989). Under these authorities, a claimant must have suffered "atrocious forms of persecution" such that the "attitudes of the population" or the predicament in the "mind of the refugee" would result in pain and suffering by the individual. *Matter of Chen*, 20 I. & N. Dec. at 21 (quoting Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva, 1979)).

Since we agree with the IJ that petitioners have not suffered past persecution, it follows that petitioners are not eligible for humanitarian asylum, which requires petitioners to have suffered "atrocious forms" of past persecution.

14

**B. Withholding of Removal**

Even if denied a discretionary grant of asylum, one is still eligible for non-discretionary relief through withholding of removal. The considerations for asylum and withholding of removal are similar, except that the latter requires the claimant to establish a "clear probability of persecution." *Cardoza-Fonseca*, 480 U.S. at 431-32. The "clear probability" standard requires that the applicant prove the likelihood of future persecution with even more certainty than the "well-founded fear" standard that applies to asylum claims. *Id.*

Since we affirm the IJ's finding that petitioners did not possess a "well-founded" fear of persecution, we must also affirm the IJ's conclusion that they did not face a "clear probability" of persecution. *Liti v. Gonzales*, 411 F.3d 631, 641 (6th Cir. 2005).

**C. Convention Against Torture**

Following Article 3 of the Convention Against Torture, courts have held that an alien may not be removed to a country "where it is more likely than not that he will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official." *Mostafa v. Ashcroft*, 395 F.3d 622, 624-25 (6th Cir. 2005) (citing *Matter of G-A-*, 23 I. & N. Dec. 366, 367 (BIA 2002)). Applicable regulations define "torture" as

> any act by which *severe pain or suffering*, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

15

8 C.F.R. § 208.18(a)(1) (emphasis added).

Petitioners did not suffer "severe pain or suffering" in the past, and the IJ held that they would suffer no worse in the future. We defer to the IJ's factual assessment and thereby conclude that petitioners are not "more likely than not" to suffer "severe pain or suffering" upon their return to Albania.

For the reasons stated above, we AFFIRM the decision of the BIA DENYING petitioners asylum, withholding of deportation, and relief under the Convention Against Torture.