NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0374n.06
Filed: June 5, 2007

No. 05-3898

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| AMADOU KANE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE BOARD |
| | ) | OF IMMIGRATION APPEALS |
| ALBERTO R. GONZALES, Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |

**Before: DAUGHTREY and MOORE, Circuit Judges, and SHADUR, District Judge.**[*]

**Shadur, District Judge.** Mauritanian citizen Amadou Kane ("Kane") brings this appeal

pursuant to 8 U.S.C. §1158(a) and (b),[1] seeking review of a decision by the Board of Immigration

Appeals ("Board") that denied him asylum. Kane contends that the Immigration Judge ("IJ," whose

opinion the Board affirmed summarily) erred (1) in discounting Kane's credibility and (2) in

concluding that even if the IJ had found his testimony credible, Kane had not established a record

of past persecution or a well-founded fear of future persecution. Kane also seeks withholding of

deportation. Because there is substantial evidence to support the IJ's conclusion that Kane has not

---

[*] Honorable Milton I. Shadur, United States District Judge for the Northern District of
Illinois, sitting by designation.

[1] For convenience, all further citations to Title 8 provisions will take the form "Section --,"
omitting the prefatory "8 U.S.C."

demonstrated a well-founded fear of persecution, we must deny Kane's petition for review.[2]

Background

Kane entered the United States with a Mauritanian passport and a valid B-1 visa in May 2001. As his visa permitted only a short stay in the United States, Kane applied for political asylum. Born in Mauritania in 1967, Kane is a member of the Fulani ethnic group that has historically been discriminated against and oppressed by other dominant ethnic groups and Mauritanian authorities. According to Kane, it is because of his ethnicity, his family's political dissent and his own political opinions and activity--or at least the political opinions and activity imputed to him by the authorities--that he fears persecution if he returns to Mauritania, and he thus seeks asylum in the United States.

Kane's account begins with the imprisonment of his brother in 1987 after having been accused and convicted of plotting a coup against the Mauritanian government. Kane's brother was freed in 1991. In 1989 Kane's father was jailed for one week when he protested publicly against the forced exile of thousands of Mauritanian citizens to Senegal.

Kane himself first ran into trouble with the police in 1989. In that year, while searching for

---

[2] In his brief Kane also refers to the Convention Against Torture ("Convention"). But before the IJ Kane explicitly waived any relief to which he might have been entitled under the Convention, and he has offered no argument as to why we should ignore that explicit waiver--other than to state *ipse dixit* that his Convention claims were "erroneously withdrawn by his attorney." We therefore need not consider any Convention issues.

his family's grazing sheep outside his village, he was assaulted and detained by individuals of a rival ethnic group who beat him and threatened to kill him but ultimately turned him over to Mauritanian authorities. Kane was then held for two weeks at a police station, where he was regularly beaten, forced to "work on stones" and had his life threatened. After two weeks Kane was released to the responsibility of his parents, and he was forced to promise that he would not leave the village again to look for his family's missing sheep.

Kane's next negative encounter with Mauritanian authorities was three years later in 1992, when police in his village broke up a cultural celebration during the International Week of Trees and arrested Kane and several of the other organizers and participants. At the police station Kane and the other arrestees were kicked, beaten with sticks and accused of organizing a political event against the government rather than a simple educational and cultural celebration. After two days Kane and the others were released, again to the responsibility of his parents and the village elders.

Five years later in 1997, while Kane was volunteering with the U.S. Peace Corps, he was again detained by the police, beaten and accused of providing information about the government to the Peace Corps. Kane did not testify that he was held for any particular length of time, but the police did search his home and interrogate him at the station.

Two years later in 1999, Kane was fired from his job with an agricultural development agency after he refused to take part in what he viewed as extensively corrupt practices that exploited poor farmers. After his termination Kane was required to report to a police station every month so

that the police could keep track of him and question him regarding the bank with which he worked. Kane had to continue his monthly reports until he left Mauritania in May 2001. As those monthly reports went on, the police began to inquire more extensively into Kane's political activities and affiliations (Kane had been a member of the "UFD" opposition party for many years), and he began to fear for his life in January 2000. Kane did not, however, report any physical abuse or any overnight or longer detention in that period.

From his first arrest in 1989 to his departure from Mauritania in 2001, it appears that Kane dealt with those adversities quite ably. He continued his schooling, ultimately earning an advanced degree in economics. Sometime thereafter he obtained employment with the "Mauritanian Cabinet Adviser for Agriculture and Development Project," from which he was terminated later in 1999 after his corruption complaints. Then in May 2000--during the period he was required to report to the police each month--he secured a job with the "Bureau of Study for Agriculture Development" ("SERADE"), which appears to have been a private institution that carried out projects for the Mauritanian government. Kane remained with that job until he was granted a two month vacation in May 2001 and seized that opportunity to travel to the United States and apply for asylum.

In October 2003 an IJ denied Kane's application, resting that conclusion on two independently sufficient grounds: (1) that Kane's testimony was not credible and (2) that even had that not been the case, Kane had not met his burden of demonstrating past persecution or a well-founded fear of persecution based on any of the protected grounds. As to the credibility finding, the IJ pointed to multiple "material discrepancies" in Kane's testimony. As for the other issue, the IJ

concluded that Kane's record of imprisonment and abuse did not amount to past persecution. And given Kane's extended period of residence (staying more than a year after he began to fear for his life in January 2000), his education and employment in Mauritania combined with his apparent freedom to obtain a passport and visa to the United States, the IJ concluded that Kane did not have a well-founded fear of future persecution.

On June 14, 2005 the Board affirmed the IJ's decision without opinion. Kane then filed a timely petition for review of the Board's decision with this Court.

<u>Asylum</u>

We have jurisdiction pursuant to Section 1252(a)(1) to hear petitions for review of final Board removal orders in asylum cases (*Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004)). Section 1158(a) and (b) give the Attorney General the discretion to grant asylum to any qualifying "refugee" (*id.*). In turn the Attorney General has delegated that authority to the Board and its IJs (*id.* at 702 n.1). Thus, when presented with an application for asylum, an IJ must decide (*Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998)(internal quotation marks omitted)):

> (1) whether the applicant qualifies as a "refugee" as defined in §1101(a)(42)(A), and
> (2) whether the applicant merits a favorable exercise of discretion by the [immigration judge].

With respect to that first step, Section 1101(a)(42)(A) defines a "refugee" as an alien who is:

> unable or unwilling to return to, and is unable or unwilling to avail himself or herself

of the protection of, [his or her home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

*Ramaj v. Gonzales*, 466 F.3d 520, 529 (6th Cir. 2006)(internal citations and quotation marks omitted) recently summarized the burden that requirement places on an asylum applicant:

> The asylum applicant bears the burden of establishing that he or she qualifies as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution. Once the applicant shows that he or she has suffered from past persecution, the applicant is presumed to have a well-founded fear of future persecution. This presumption can be rebutted only through establishing by a preponderance of the evidence that since the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return.

Our statutory role in the review of such Board determinations is a limited one. We review the Board's factual conclusions at step one only for substantial evidence, and we must consider those determinations "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary" (Section 1252(b)(4)(B); *Yu*, 364 F.3d at 702-03). Under that standard, as reviewing courts oft repeat, even if we were to disagree with the IJ's factual determinations, that alone would not permit us to set aside the reasoned conclusions below unless the evidence "not only supports a contrary conclusion, but indeed *compels* it" (*Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)(internal quotation marks omitted; emphasis in original)).

Finally, when as here the Board summarily affirms an IJ's decision without opinion, we look to that judge's opinion for substantial evidence supporting the judge's conclusions (*Yu*, 364 F.3d at

702). And as a further constraint on our role, we must always be mindful of the generous definition of "substantial evidence" announced by the Supreme Court in *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1993) and basically codified in Section 1252(b)(4)(B)(*Yu, id.*).

It is against that backdrop that we must determine whether Kane has successfully borne the burden of "producing evidence that he has suffered past persecution or has a well-founded fear of future persecution" (*id.*, 364 F.3d at 703) if he were to be returned to Mauritania. Because as stated earlier the IJ concluded that Kane failed to meet that burden for two independently sufficient reasons, and because we find that the IJ's determinations as to the second ground are supported by substantial evidence, we need not address the issue of Kane's credibility.

In an effort to meet his burden of showing past persecution, Kane testified to multiple run-ins with Mauritanian authorities. First in 1989 was his two week imprisonment after being ambushed by a rival ethnic group, during which time he was threatened, beaten repeatedly and forced into hard labor. Next were the police beatings and two days in custody in 1992 when the police broke up his International Week of Trees celebration. Five years later in 1997 he was again detained by the police, interrogated, beaten and accused of providing information to the Peace Corps. Finally in 1999 (after his termination from his development agency job), his monthly reporting to the police with the ensuing interrogations into his political activity began, continuing until his departure for the United States in 2001.

As noted, the IJ concluded that Kane's history of trouble with Mauritanian authorities did not

amount to past persecution. With no definition of "persecution" as Section 1101(a)(42)(A) uses that term (*Mikhailevitch*, 146 F.3d at 389), the statute provides little guidance in reviewing the IJ's conclusion. *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004), quoting earlier authority, reconfirms that "[p]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive." Moreover, *Mikhailevitch*, 146 F.3d at 390 instructs that only if we decide that any reasonable factfinder would be compelled to conclude that Kane had "suffered physical punishment, infliction of harm, or a significant deprivation of liberty on account of" one of the protected grounds may we reverse the IJ's determination here that Kane did not suffer past persecution.

On that score the IJ concluded that Kane's repeated altercations with the police did not amount to persecution because the level of physical mistreatment and deprivation of liberty suffered by Kane did not rise to the level of persecution. We note that Kane did not report that any of the multiple beatings (occurring several years apart from each other) resulted in injuries requiring medical treatment or permanent injury (at worst he sustained scars on his knees from being forced to kneel and work on stones during his 1989 imprisonment). One witness did testify that Kane appeared to be bruised and his clothes torn after returning from prison in 1992. As for his total time of detention that appears to comprise two weeks in 1989, two days in 1992, some number of hours in 1997 and his monthly reports to the police beginning in 1999.

There surely is caselaw that arguably supports the conclusion that a record such as this does not compel a finding of past persecution by the IJ. To look outside our Circuit for a moment, *Al*

*Tawm v. Ashcroft*, 363 F.3d 740, 743 (8th Cir. 2004) held that "[t]he mere presence of some physical harm does not require a finding of past persecution." There the asylum applicant had been detained only on two occasions four years apart for a few hours each time, leading *Al Tawm* to hold that such "[b]rief periods of detention do not necessarily constitute persecution," and to state further that the Eighth Circuit had "rejected claims involving equally serious or more serious abuse" (*id.*). And *Dandan v. Ashcroft*, 339 F.3d 567, 574 (7th Cir. 2003) held that a beating resulting in a swollen face did not compel a finding of persecution, absent some specific evidence of the severity of the beating such as a record of broken bones. *Dandan*, *id.* also found that a detention of three days without food did not require a finding of past persecution (see also *Skalak v. INS*, 944 F.2d 364, 365 (7th Cir. 1991)).

We are mindful that it is rarely, if ever, the case that any prior decision stands truly on all fours with the record we are presented for review. But given the weight of the caselaw that we have surveyed, Kane's detentions and interrogations from 1992 through 2000 do not create a record that would compel us to reverse the IJ's determination that those instances did not amount to past persecution -- especially considering Kane's lack of specificity as to his actual treatment on those occasions (see *Dandan*, 339 F.3d at 574).

To be sure, Kane's testimony about the beatings and harsh labor that he endured for two weeks while imprisoned in 1989 might well present a different story. Kane's most detailed description of his treatment at that time came in his Personal Declaration:

> The authorities humiliated us by making us kneel on stones in the hot sun for hours each day, we were beaten with weights, put into the jaguar position, tied spread-eagle and beaten.

While Kane did not provide comparable detail in his hearing testimony, the account in his Personal Declaration (assumed to be credible for present purposes) certainly sounds like persecution to us. But that would not change the outcome here, for the IJ nonetheless found that there was sufficient evidence to support the government's rebuttal case that due to events in Kane's history since that time and changed conditions in Mauritania generally, Kane no longer has a well-founded fear of persecution should he be returned there (see *Koliada v. INS*, 259 F.3d 482, 487 (6th Cir. 2001)).

For that purpose the IJ pointed out that at the time of Kane's imprisonment and physical abuse in 1989, thousands of his fellow citizens -- including those from his own ethnic group -- were being forcibly deported to Senegal. In contrast, Kane was released to his parents after two weeks and was allowed to remain in Mauritania for more than ten years before he departed on his own initiative. During that time he was able to continue his education leading to multiple higher degrees and to obtain employment with the Mauritanian Cabinet Adviser for Agriculture and Development Project and then with SERADE, both closely associated with the Mauritanian government. And whatever deprivation of liberty might be ascribed to his monthly reporting to the police beginning in 1999, it did not prevent him from obtaining a passport from the Mauritanian government and a visa to the United States and from departing the country through government authorities at Nouakchott airport under the ruse of an extended vacation.

*Koliada*, 259 F.3d at 488 is but one example of the decisions finding that evidence such as an applicant's extended period of residency in his home country after an instance of past persecution, or such as an applicant's freedom to obtain a passport from his home government and depart his country, reasonably supports a conclusion of changed conditions that rebut any inference of a current well-founded fear of future persecution based on those acts of past persecution (see also *Novoa-Umania v. INS*, 896 F.2d 1, 3-4 (1st Cir. 1990); *Rodriguez-Rivera v. INS*, 848 F.2d 998, 1006 (9th Cir. 1988)(per curiam)).   Moreover, the IJ pointed to the 2002 State Department Report on Mauritania ("Report") for evidence that the background environment in Mauritania has significantly changed since the peak of those troubles around 1989-91, including a  reduction in ethnic tension and the return of exiles.  In that regard Kane argues that such State Department reports "should not be taken as the immutable gospel truth" and that the IJ made selective use of the Report, thereby making any conclusions drawn from it unreliable.  While we have recognized reasonable avenues for the impeachment of such State Department reports  (see *Koliada*, 259 F.3d at 487-88), we cannot say that the IJ's use of the Report  here was so unreasonable as to compel a contrary finding-- especially considering the use of the Report in tandem with his individualized  findings as to Kane.[4]

Kane's effort to present evidence that would compel us to come to a conclusion that he maintains a well-founded fear of persecution and reverse the IJ's determination is to no avail.  To

_____

[4] Two of our unpublished opinions, *Fall v. Gonzales*, No. 05-4470, 2007 WL 627380, at *1, 3 (6th Cir. Feb. 20, 2007) and *Diallo v. Gonzales*, No. 03-4068, 2005 WL 1901829, at *2-4 (6th Cir. Aug. 8, 2005), found that State Department reports on Mauritania provided substantial evidence to support IJs' determinations that conditions had significantly changed for historically oppressed ethnic groups (including Fulani) in Mauritania.

establish a present well-founded fear of persecution, Kane must show both that he honestly fears persecution should he return to Mauritania (a subjective component) and that his fear is reasonable (an objective component) (*Ali*, 366 F.3d at 410-11). To meet the objective component Kane must (*Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005)(internal quotation marks and citation omitted):

> demonstrat[e] that persecution is a reasonable possibility should he be returned to his county of origin. The applicant need not demonstrate that he will probably be persecuted if returned because one can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.

Kane's statement conforms to the subjective fear requirement--he says he began to fear for his life in January 2000 during his monthly reports to the police. To support the reasonableness of that fear, Kane largely points to his record of arrests and beatings, buttressing that evidence by arguing that he reasonably fears that he will suffer retaliation upon his return because of his father's and brother's political activity in opposition to the Mauritanian government in the late eighties. But the reasonableness of that continuing fear is similarly undermined by the fact that Kane lived in Mauritania for more than ten years after his family's acts of political opposition, during which time Kane was able to obtain significant education and employment as well as the freedom to depart from Mauritanian with the apparent blessing of the government. As such, the IJ was unpersuaded that the record created a foundation for a reasonable fear of future persecution should Kane return to Mauritania based on those past events.

Kane of course also points to the undeniable history of oppression and mistreatment of members of his ethnic group, Fulani, by the Mauritanian government to suggest that his mere

membership in that group creates a reasonable possibility that he will be imprisoned, tortured or killed if he returns. But again Kane's individual history while living in Mauritania amidst that period of ethnic oppression, coupled with the evidence of changed conditions for Fulani in Mauritania, reasonably rebut any inference that Kane himself would be a target should he return.

In the end, our standard of review controls the outcome. On the administrative record before us, Kane has not met his burden of demonstrating that any reasonable factfinder would be compelled to conclude that Kane held a well-founded fear of future persecution should he return to Mauritania. Hence we may not set aside the IJ's decision (see *Mikhailevitch*, 146 F.3d at 390).

Conclusion

Because we find that substantial evidence supports the IJ's decision that Kane failed to demonstrate a continuing well-founded fear of future persecution for asylum purposes, Kane similarly cannot meet the more stringent standard--demonstrating a clear probability of persecution--to qualify for withholding of deportation (see *Ali*, 366 F.3d at 411). Thus we DENY Kane's petition for review.