RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0031p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____



MOHAMED HAIDER,

                       *Petitioner,*

      *v.*

ERIC H. HOLDER, JR.,

                       *Respondent.*

No. 08-4010

On Petition for Review from the
Board of Immigration Appeals.
No. A96 163 022.

Argued: October 15, 2009

Decided and Filed: February 10, 2010

Before: BOGGS, MOORE, and GIBSON, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Scott Bratton, MARGARET WONG & ASSOCIATES CO., LPA, Cleveland, Ohio, for Petitioner. Nehal H. Kamani, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Scott Bratton, MARGARET WONG & ASSOCIATES CO., LPA, Cleveland, Ohio, for Petitioner. Nehal H. Kamani, Aviva L. Poczter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

     MOORE, J., delivered the opinion of the court, in which GIBSON, J., joined. BOGGS, J. (pp. 19-22), delivered a separate dissenting opinion.

_____

[*]The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.   Mohamed Haider ("Haider") petitions this court for review of the order of the Board of Immigration Appeals ("BIA") denying his application for withholding of removal under the Immigration and Nationality Act ("INA") and the United Nations Convention Against Torture ("CAT"). The Immigration Judge ("IJ") denied relief and the BIA affirmed on the ground that Haider could not prove that his life or freedom would be threatened on account of a protected ground or that he would be tortured in Algeria.  Having reviewed the evidence carefully, we hold that it compels a finding that Algerian police abused Haider because of a suspected political affiliation and that the abuse constituted persecution.  We therefore **GRANT** the petition for review and **REMAND** with respect to Haider's INA claim.  At the same time, we **DENY** the petition with respect to his claim under the CAT.

## I.  BACKGROUND

### A.  Factual Background

Haider was born in Algeria in 1977 and lived there until 2000, when he moved to France.  On September 8, 2001, he entered the United States with a fake French passport.  On December 28, 2002, he married Lisa Upshaw, a U.S. citizen.  On January 6, 2003, he filed an application for asylum, withholding of removal under the INA, and withholding of removal under the CAT.  His application remained open for five years, during which time he secured a visa through his wife, applied for and was denied adjustment of status, received a notice to appear based on his 2001 illegal entry, and was then detained pending removal.  At an April 8, 2008 hearing on his asylum and withholding claims, Haider testified to the following experiences with terrorists and police:

***The GIA.***  Haider dropped out of school in 1995 because terrorist activity in the area made it too dangerous to continue.  He began working for his uncle, a clothing seller who often traveled to Morocco, Tunisia, and Libya to buy clothes.  That year, an anti-government terrorist group known as the GIA[1] began trying to recruit Haider to spy on local police.  The GIA threatened to hurt his family, including a second uncle who was a police officer, if he refused.  He put them off with excuses, relenting only once.[2]

In 1996 or 1997, the GIA shot and killed Haider's cousin, who worked as a mechanic, for refusing to give them a car.  In 1997, the GIA murdered Haider's friend, who had worked for the police for six months, in front of him at a shopping plaza.  They said to Haider, "[i]t's been a while, we haven't seen you, how's Libya?" to show that they remembered him.  Joint Appendix ("J.A.") at 167-68.  They then kicked his friend to the ground, shot him in the leg, and shot him twice in the chest or head.  The GIA continued trying to recruit Haider through 1998.

***The Police.***  The police often searched Haider and accused him of working with terrorists.  In 1996, they stopped him as he returned home, searched him, and said "you work for the terrorists."  J.A. at 144.  In May 1996, four officers searched him and his luggage, pulled down his pants, and "started doing stuff."  J.A. at 145.  They put a large gun into his buttocks, asked tauntingly "how do you like that?" and demanded that he admit to aiding the terrorists.  J.A. at 145-46.  When they released him, they warned "it's going to be the same thing" the next time.  J.A. at 146.

That summer, officers in another area stopped Haider and two friends for questioning.  The police detained him for five hours, took his clothes off, spat in his face, and repeatedly struck him in his back with a gun, causing bruising.  They accused him of being a terrorist spy and promised worse abuse if they ever saw him again.

---

[1] GIA stands for Armed Islamic Group, from the French "Groupe Islamique Armé."  After the military seized control of the Algerian government in 1991 to prevent the rise of an Islamic political party, the GIA sprung up in response and launched terrorist attacks on government institutions and officials throughout the 1990s.

[2] Haider watched an area and reported back that he had seen nothing.  The government argued below that this act made him ineligible for relief.  Neither the IJ nor the BIA addressed this point, and the government has not raised it in its brief on appeal.

In February or March 1997, police accosted him on the street and struck him four times in his right ear. The officers put him against a wall, searched him and his luggage, and stole some of his merchandise. One of them also pulled down Haider's pants, put his hands on and in Haider's buttocks, and did the same with a large gun. Again, they threatened him with worse the next time. Two months later, Haider went to see a doctor about the flu, and the doctor informed him he had blood in his right ear.

On July 8, 1997, officers who had abused Haider in the past ran over his brother, killing him. The police, who were responding to a reported car bomb, claimed the incident was an accident. Haider believes that they killed his brother on purpose and tried to cover it up. The police tried to get Haider to sign a statement, but he refused and convinced his family to file suit. The police then retaliated against Haider, threatening him on at least twenty occasions. In October 1997, an officer struck Haider in his back and shoulder three times with a gun and warned him not to "come around us anymore." J.A. at 165-66. The police also detained his father for two weeks, during which time they removed his clothes, beat him severely, and demanded that he drop the suit. Haider's family had to take his father to a mental hospital and put him on medication. In addition, the police tormented Haider's mother, visiting her over fifty times and threatening to take Haider. In 1999, police officers visited Haider's mother and asked, "where is your son, we haven't seen him. Is he working for the GIA, the terrorists? We thought so . . . ." J.A. at 173.

During his final years in Algeria, Haider moved between relatives to avoid the police. He illegally entered France in 2000 and the United States in 2001, arriving just before the attacks of September 11th. In January 2007, Haider's mother visited the United States. She told him that the police had asked about him in 2002 and that the GIA was still active in their area.

**B. Administrative Rulings and Petition for Review**

The IJ delivered his decision orally. First, he found Haider's asylum claim time-barred. An asylum applicant must show by clear and convincing evidence that he filed within one year of arrival in the United States, a period that can be extended due to extraordinary circumstances. 8 U.S.C. § 1158(a)(2)(B), (D). Haider filed his application almost sixteen months after entering the country. The IJ found that his fear in light of post-September-11th government suspicion of Muslim men explained why he did not file immediately, but not why he waited sixteen months.

Second, the IJ discussed Haider's credibility. He found nothing in Haider's demeanor to indicate deception and described the testimony as "fairly detailed and, for the most part . . . plausible." J.A. at 80. However, he found Haider's failure to include the police incidents in his application "troubling." J.A. at 81. The IJ was "not really persuaded" by Haider's explanation that he had been too embarrassed to include this information, as Haider seemed to testify to the events without difficulty. J.A. at 81. The IJ also noted the absence of corroborating statements from family members or a doctor and found it "curious" that Haider reported no contacts with the GIA or police after 1999. J.A. at 82. He concluded that the sum of these concerns "detracts from the respondent's credibility . . . meaning that the Court will give less weight to the respondent's testimony." J.A. at 83. The IJ did not say that he believed some parts of the testimony but not others.

Third, the IJ found Haider ineligible for withholding of removal under the INA. He noted that the police suspected Haider of being connected to terrorists, but he did not decide whether Haider had established a protected ground. Instead, the IJ held that the GIA's recruitment efforts did not constitute past persecution and that the police, in light of the single five-hour detention and the fact that Haider never needed medical attention, had only harassed him. The IJ further found no likelihood of future threat to life or freedom, emphasizing that Haider reported no contact with the GIA or police from 1999 to 2000.

Finally, the IJ denied relief under the CAT, finding that the police abuse was not torture and that Haider had not shown that his treatment would be worse in the future.

The BIA adopted and affirmed the IJ's decision on August 6, 2008. It agreed that the asylum application was time-barred. The BIA stated that "the IJ did not make a specific credibility finding" but committed "no clear error" in "finding that the respondent failed to adequately meet his burden of proof" under the INA. J.A. at 2. The BIA affirmed the IJ's reasoning that the police abuse did not amount to persecution and added that Haider was not targeted for his religious beliefs or political opinion, "imputed or otherwise." J.A. at 3. The BIA also affirmed the denial of the CAT claim because the abuse did not meet the definition of torture. Haider timely filed a petition for review. This court stayed his removal on October 27, 2008.

## II. ANALYSIS

### A. Standard of Review

Because the BIA adopted and added to the IJ's decision, we review the opinion of the IJ and the BIA's supplemental comments. *See Bi Feng Liu v. Holder*, 560 F.3d 485, 490 (6th Cir. 2009). Haider does not challenge the rejection of his asylum claim, as this court cannot review factual findings of timeliness. 8 U.S.C. § 1158(a)(3); *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006). Thus, the petition is limited to the denial of withholding of removal under the INA and the CAT, relief that would be available regardless of the filing date. We review the IJ's and BIA's findings for substantial evidence and may reverse only if the decision was "manifestly contrary to law," 8 U.S.C. § 1252(b)(4)(C), that is, if the evidence "not only supports a contrary conclusion, but indeed *compels* it," *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (internal quotation marks omitted).

**B. Two Preliminary Issues**

Before arguing the merits of his eligibility for withholding, Haider raises two errors that he believes require remand:  (1) the BIA's application of the wrong standard of review in affirming the IJ's decision, and (2) the IJ's failure to make an explicit credibility determination.

The BIA must review an IJ's factual findings for clear error and legal conclusions de novo.  8 C.F.R. § 1003.1(d)(3); *Matter of A-S-B-*, 24 I. & N. Dec 493, 496 (BIA 2008).   Haider points to two parts of the BIA's opinion that appear to apply an improperly deferential standard.  First, the BIA stated, "[w]e find no clear error on the part of the Immigration Judge in finding that the respondent failed to adequately meet his burden" under the INA.  J.A. at 2.  Second, the BIA appeared to apply the substantial-evidence standard, observing that "the record does not compel the conclusion that he reasonably feared the GIA would persecute him because of a political opinion." J.A. at 3.  These statements do not reflect the proper standard of review for mixed questions of law and fact.  In the rest of the opinion, however, the BIA wrote in decidedly de novo terms.  It held, "[b]y the respondent's own admission, the actions of the GIA and the police were not on account of his religious beliefs or political opinion, imputed or otherwise. . . . We find that the respondent has not established that either of his alleged persecutors acted on account of his opinion, imputed or otherwise." J.A. at 3.  The BIA should have taken more care with its opinion and avoided the improper statements, but it denied relief based on its own view of the evidence.

Next, Haider objects that the IJ failed to make an unambiguous credibility determination.  On the one hand, the IJ found that Haider's demeanor suggested honesty and that his testimony was detailed and mostly plausible.[3]  On the other hand, he found it "troubling" that Haider failed to include the police incidents in his application and to supply corroborating documents.  J.A. at 81.  The IJ resolved to "give less weight to the

---

[3]The BIA read the IJ's opinion as making exactly the opposite finding.  It wrote that the IJ "discussed the lack of detail and vagueness in the respondent's testimony compared with his application for relief."  J.A. at 2.  The BIA also referred to "Albania" instead of "Algeria" at one point.  J.A. at 3.

respondent's testimony," J.A. at 83, but this statement does not answer the crucial question of what the IJ believed and did not believe occurred. As the BIA put it, the IJ "did not make a specific credibility finding in this case." J.A. at 2.

Haider argues that the case must be remanded for an explicit credibility determination, as he contends that meaningful review is impossible on the current record. The government urges us to follow the language of our unpublished opinion in *Maklaj v. Mukasey*, 306 F. App'x 262 (6th Cir. 2009), which stated that when an IJ fails to "make a clear adverse credibility determination," even if he "clearly doubted" the applicant's testimony, this court "accept[s that] testimony as true." *Id.* at 264 n.4. Both suggestions are ill-fitted to the situation we confront here. In this case, the IJ clearly expressed doubt about the applicant's version of the events. Lack of credibility, however, was not the basis for his denial of relief, or for the BIA's dismissal of the appeal. Both the IJ and the BIA instead held that, even assuming Haider's allegations were true, they did not amount to past persecution. J.A. at 2-3, 83-84. An immediate remand would not necessarily prevent us from having to resolve the past-persecution question on subsequent review, since the BIA might determine that Haider was credible or might reach the opposite conclusion based on insubstantial evidence. At the same time, assuming credibility and then ordering withholding of removal usurps the role of the IJ as factfinder. *See* 67 Fed. Reg. 54,878, 54,890 ("Immigration judges are better positioned to discern credibility and assess the facts with the witnesses before them . . . .").

We therefore adopt the following procedure: when an IJ or the BIA expresses suspicion about an applicant's lack of credibility but the BIA fails to make an explicit adverse determination and instead denies relief on some other basis, we will assume that the applicant was credible in order to review the actual grounds for the ruling. This procedure tracks the analytical path taken by the IJ or the BIA. If we conclude that the stated basis for denying relief was supported by substantial evidence, further review is foreclosed. If the evidence compels the opposite result, however, we will remand for a credibility determination. *See, e.g.*, *Cordon-Garcia v. INS*, 204 F.3d 985, 993-94 (9th

Cir. 2000) (holding that the applicant demonstrated past persecution and a well-founded fear of future persecution but remanding for a credibility finding because the BIA had avoided ruling on the IJ's concerns).[4]

This approach is perfectly consistent with the facts of *Maklaj*. In that case, the panel accepted the petitioner's testimony as true but upheld the BIA's denial of asylum and withholding based first on his failure to produce evidence corroborating his claim of past persecution and second on a finding that changed country conditions defeated any fear of future persecution. 306 F. App'x at 264.[5] The assumption of credibility was appropriate in spite of the IJ's skepticism of the applicant's testimony because credibility was not necessary to the case's outcome.

Following the procedure laid out above, we shall also assume Haider's credibility and address the question of past persecution. Because, as we explain below, we conclude that the finding that Haider had not been persecuted was not supported by

---

[4] The government cites three cases from other jurisdictions in support of its position that credibility must be assumed and remand avoided, none of which requires us to rethink our reasoning. The first, *Chen Lin-Jian v. Gonzales*, 489 F.3d 182 (4th Cir. 2007), is consonant with our approach. There, the court reversed the IJ's adverse ruling on the issue of past persecution and therefore remanded for a credibility determination. *See id.* at 193 (Shedd, J., concurring).

In the second case, *Toure v. Attorney General*, 443 F.3d 310 (3d Cir. 2006), the court remarked that "where an IJ or the BIA fails to make an explicit credibility finding, we will proceed as if the applicant's testimony were credible," citing three cases in support. *Id.* at 326. In two of those cases, the IJ made unfavorable remarks about the applicant's credibility, but the BIA denied relief without making a clear adverse finding. The courts applied exactly the approach that we adopt here: assuming, but not determining, credibility in order to reach the alternative substantive basis on which the BIA denied relief, and then remanding for a credibility determination where relief could not properly be denied on that alternative basis. *See Kayembe v. Ashcroft*, 334 F.3d 231, 235, 237-39 (3d Cir. 2003); *Zhen Hua Li v. Att'y Gen.*, 400 F.3d 157, 163-64, 170 (3d Cir. 2005). The third case involved IJ and BIA decisions that neither made a clear determination nor contained any negative comments about the petitioner's credibility; the court assumed credibility and ordered relief. *Lusingo v. Gonzales*, 420 F.3d 193, 197 n.5, 202 (3d Cir. 2005). This is an approach that we likewise endorse: when neither the IJ nor the BIA intimates any concern about a petitioner's credibility, it is reasonable for a reviewing court to infer that they found the petitioner credible.

In the third case cited by the government, *Kataria v. INS*, 232 F.3d 1107 (9th Cir. 2000), the IJ expressed significant concerns about the petitioner's testimony but did not make an explicit adverse credibility finding and denied relief for lack of corroborative evidence. *Id.* at 1111-12. The court accepted the petitioner's testimony as true, reversed the administrative decision based on its rule that "the BIA may not require independent corroborative evidence from an asylum applicant who testifies credibly," and granted the petition for withholding of removal. *Id.* at 1113, 1115. The *Kataria* court converted a mixed credibility finding into a positive one and issued relief on its basis. Were we to face a similar case, the approach we adopt today would require a remand to the BIA on credibility.

[5] *Maklaj* cited *Gilaj v. Gonzales*, 408 F.3d 275 (6th Cir. 2005), in support of its assumption of credibility. In *Gilaj*, however, this court accepted the petitioners' testimony as true because the IJ had found them to be credible. *See id.* at 285-86. *Gilaj* was not a case in which the IJ failed to make a credibility determination.

substantial evidence, we must remand to the BIA for determination of which parts of Haider's testimony were and were not credible. *See INS v. Ventura*, 537 U.S. 12, 16-17 (2002) (holding that the courts of appeals should remand to the BIA for determination of factual issues in the first instance).[6]

## C. Withholding of Removal Under the INA

Under § 241(b)(3) of the INA, the government may not remove an alien to a country if he can prove that it is more likely than not that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). If the applicant establishes past persecution, it is presumed that his life or freedom would be threatened in the future. 8 C.F.R. § 208.16(b)(1)(i). That presumption can be rebutted if an IJ finds that there has been a fundamental change in circumstances in the proposed country of removal or that the applicant could reasonably be relocated to another part of that country, such that his life or freedom would not be threatened. *Id.* § 208.16(b)(1)(i)(A)-(B). If the applicant cannot establish past persecution, he retains the burden of proving "that it is more likely than not that he . . . would be persecuted on account of [a protected ground] upon removal to that country." *Id.* § 208.16(b)(2).

Haider argues that the evidence compels a finding that he was abused on account of imputed political opinion and that the abuse constituted persecution. As explained below, we agree.

### 1. Protected Ground:  Imputed Political Opinion

Invoking a ground not relied upon by the IJ, the BIA denied Haider's application for lack of a nexus between the abuse he suffered and any protected ground listed in the statute. Haider responds that both the GIA and the police targeted him because of a political opinion they imputed to him. The Supreme Court has never decided whether *imputed* political opinion can be a protected ground, but the Sixth Circuit has held in an

---

[6]As in the usual course, the BIA's or IJ's credibility determination would then be reviewable by this court for substantial evidence.

unpublished order that it is. *See Abdulnoor v. Ashcroft*, 107 F. App'x 594, 595 (6th Cir. 2004) (unpublished order) (remanding because, although applicant was not politically active, "[t]he BIA apparently did not consider that imputed political opinion is a protected ground"); *see also Pascual v. Mukasey*, 514 F.3d 483, 486-87 (6th Cir. 2007) (noting that most circuit courts have approved this approach, that this court did so in *Abdulnoor*, and that the Supreme Court's emphasis on the persecutor's motive suggests this approach is appropriate). We reaffirm that conclusion.

Haider has no argument as to the GIA. Nowhere in the briefing does he delineate the imputed political opinion for which the terrorist group allegedly persecuted him. To the extent he might be arguing that the GIA saw his refusal to join them as politically motivated, there is no support for this in the record. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (denying asylum where applicant had no evidence that guerillas believed his refusal to join them was political). Indeed, at his administrative hearing, Haider's attorney admitted that "[a]lthough he fears going back due to GIA, really, the past persecution claim in this case is the police or security forces." J.A. at 221.

The police targeted him, Haider argues, because they believed he was in league with the GIA. The IJ specifically found that "the police and security forces suspected that the respondent might have some sort of terrorist connections." J.A. at 83. The BIA went one step further, finding that the "[t]he police investigators arrested him *because* they believed that he was associated with GIA." J.A. at 3 (emphasis added). But in the immediately preceding sentence, the BIA concluded that "the actions of the . . . police were not on account of his . . . political opinion, imputed or otherwise." This statement raises the question, does suspected affiliation with an anti-government terrorist group constitute imputed political opinion?

Prior cases from this circuit and our sister courts suggest the answer is "yes."[7] In *Abdulnoor*, this court considered the petition of a former Iraqi weapons-depot guard who had been sentenced to death after weapons were missing on his watch and were found in the possession of a group planning a coup against Saddam Hussein. 107 F. App'x at 595. The applicant feared that he would be persecuted based on suspicion that he had been involved in the plot. *Id.* This court found that he had an asylum claim based on imputed political opinion. *Id.*[8] In *Kumar v. Gonzales*, 444 F.3d 1043 (9th Cir. 2006), the Ninth Circuit held that an applicant had established the imputed-political-opinion element when Kashmiri police had detained and physically abused him on the belief that he associated with Muslim terrorists. *Id.* at 1054; *see also Singh v. Ilchert*, 63 F.3d 1501, 1508-09 (9th Cir. 1995) (finding imputed political opinion based on Indian police's belief that applicant was affiliated with Sikh militants), *superseded by statute on other grounds*. Similarly, in *Uwais v. United States Attorney General*, 478 F.3d 513 (2d Cir. 2007), the Second Circuit held that an applicant who had been arrested, detained, interrogated, and sexually assaulted by Sri Lankan police based on their suspicion that she was affiliated with the Tamil Tigers had suffered abuse based on imputed political opinion. *Id.* at 517-18.

These cases and the evidence Haider presented compel the conclusion that the police abused Haider because of an imputed political opinion. Like the Iraqi coup-

---

[7] The dissent, by contrast, answers "no," in light of a BIA decision holding that "refuge is restricted to individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution." Dissent at 20 (quoting *In re Acosta*, 19 I. & N. Dec. 211, 234 (BIA 1985), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987)) (internal quotation marks omitted). The dissent emphasizes that the GIA aimed to achieve its political goals through violence, "not through political discourse of the kind we should protect 'as a matter of conscience.'" *Id.* This reasoning, even if sound, surely does not extend from cases of actually held political opinion to cases of imputed political opinion, in which applicants have not chosen to believe anything at all. An individual who was persecuted for a political opinion that he never actually held should not be barred from relief because we do not like that opinion.

[8] The Sixth Circuit has confronted similar imputed-political-opinion claims in a number of cases in which we have denied relief on bases other than failure to establish a causal nexus to a protected ground. *See, e.g.*, *Singh v. Ashcroft*, 398 F.3d 396 (6th Cir. 2005) (denying review, based on IJ's credibility determination, to applicant for withholding of removal who feared abuse from Indian police who believed he supported violent Sikh separatists); *Lam v. Ashcroft*, 112 F. App'x 477 (6th Cir. 2004) (unpublished opinion) (denying review, based on lack of evidence, to applicant who feared persecution by the Mauritanian government due to its mistaken belief that he had been part of an opposition paramilitary group); *Dabo v. Ashcroft*, 107 F. App'x 513 (6th Cir. 2004) (unpublished order) (denying review when IJ had been prepared to grant relief to alien who feared returning to Senegal because the government believed he had joined the separatists but IJ ultimately denied relief based on alien's falsification of documents).

plotters, Kashmiri terrorists, and the Tamil Tigers, the GIA is a militant group that seeks

to overthrow the government. There is no lack of evidence that the police in fact were

motivated by Haider's suspected connection to the GIA, as they repeatedly called him

a terrorist and asked about the group when they stopped him. The BIA made this causal

finding. Accordingly, the BIA's conclusion that Haider did not establish a protected

ground was unsupported by substantial evidence. We are compelled to conclude that

Haider established a protected ground based on imputed political opinion.[9]

---

[9]It might be argued that there is a difference between persecution for imputed illegitimate conduct and persecution for imputed opinion or membership in a political group. That is, if the police persecuted Haider for what they thought he did (spying for the GIA) rather than what they thought he believed (that the government should be toppled) or what group they thought he belonged to (the GIA), then there is no causal nexus to a protected ground. We believe such a distinction would be in tension with the cases described above, in which courts found that petitioners who were thought to have engaged in criminal acts had established imputed political opinion. *See Abdulnoor*, 107 F. App'x at 595 (persecutors believed petitioner helped coup-plotters obtain weapons); *Kumar*, 444 F.3d at 1047 (police arrested petitioner because they believed he was "involved in terrorist activities"); *Uwais*, 478 F.3d at 515 (police accused petitioner of knowingly housing Tamil Tigers). The dissent's attempt to distinguish these cases is unpersuasive. The dissent tries to read *Abdulnoor* differently, suggesting that "it is quite likely that *any* form of political opposition could have resulted in the sentence of death Abdulnoor found himself under, and the court certainly does not tell us differently." Dissent at 21. This suggestion is mere speculation and was not the basis of the court's opinion. The court clearly held that the petitioner was persecuted based on political opinion imputed to him because of conduct that aided a group dedicated to the violent overthrow of the government—the same sort of circumstances involved here. The dissent's comment that *Kumar* involved "whether the petitioner's imputed political opinion *was sufficient to provide a nexus*, and does not at all concern the opinion/method distinction" is misleading. Dissent at 21. The IJ in that case held that the petitioner had not established a nexus to a protected ground *because the IJ believed Kumar had not established a protected ground. Kumar*, 444 F.3d at 1053. The Ninth Circuit rejected that finding, holding that in light of the persecution suffered by the petitioner "as a result of the Jammu and Kashmir police's mistaken belief that [he] was associated with a Muslim terrorist group," "the record compels us to rule that [he] has suffered persecution on the basis of an imputed political opinion." *Id.* at 1054. Similarly, the dissent's treatment of *Uwais* sidesteps the core holding of that case, which was that the petitioner "was arrested, detained, interrogated, and severely questioned on account of imputed political opinion based on her suspected affiliation with the armed Tamil Tiger tenants." 478 F.3d at 517. In the end, the dissent simply disagrees with these courts and says as much. Dissent at 21.

      Even if the conduct-opinion distinction were appropriate in some cases, it has no application here. The BIA explicitly found that the police abused Haider "because they believed that he was associated with the GIA"—i.e., because of his imputed membership with a political organization. J.A. at 3. The dissent doubts that the police viewed the GIA as a political organization, based on their reference to Haider as a "terrorist" as opposed to a "dissident" or an "activist." The police's use of the word "terrorist" is a thin reed indeed on which to hold that Haider has not established a protected ground. The record below made clear that the GIA had a political agenda. J.A. at 255 (State Department report explaining that the group "launched terrorist campaigns against government figures and institutions to protest the banning of the Islamist parties"). The word "terrorist" can carry a political valence, and we have no indication that the police intended it to refer to violent acts alone and not also anti-government activity. It demands too much to require that the police, while abusing an applicant, use epithets as pro-opposition as those suggested by the dissent.

### 2. Past Persecution

The INA does not define "persecution." *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998), but this court has mapped the contours of its meaning in past cases. Persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Id.* at 390. The fact of *some* physical harm may not be sufficient, *Kane v. Gonzales*, 236 F. App'x 178, 182 (6th Cir. 2007) (unpublished opinion), but harm need not be life-threatening to constitute persecution, *De Leon v. INS*, 99 F. App'x 597, 599 (6th Cir. 2004) (unpublished opinion). In some cases, an applicant need not prove physical harm at all. *See, e.g.*, *Ouda*, 324 F.3d at 454 (woman who never herself had been beaten established persecution based on economic deprivation and expulsion). Typically, though, the "[t]ypes of actions that might cross the line from harassment to persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Zacarias v. Gonzales*, 232 F. App'x 458, 462 (6th Cir. 2007) (unpublished opinion) (internal quotation marks omitted). An applicant must show that she was "specifically targeted" and was not "merely a victim of indiscriminate mistreatment." *Gilaj*, 408 F.3d at 285.

The IJ (and this court) must evaluate past persecution based on "the overall context of the applicant's situation." *Id.* That is, the IJ must view the evidence in the aggregate, as "a collection of harmful events, even though they may not qualify individually as persecution, [that] may taken together constitute persecution." *Stenaj v. Gonzales*, 227 F. App'x 429, 433 (6th Cir. 2007) (unpublished opinion); *see also Poradisova v. Gonzales*, 420 F.3d 70, 79-80 (2d Cir. 2005); *In re O-Z- & I-Z-*, 22 I. & N. Dec. 23, 26 (BIA 1998). In reviewing the finding that Haider was not persecuted in Algeria, this court takes his allegations as credible, as discussed above.

We hold that the evidence compels a finding of persecution. Haider testified to being repeatedly stopped, searched, and accused of being a GIA terrorist by police. They confiscated his property, stealing clothes from his suitcases of merchandise. The

police physically assaulted him, once punching him four times in the ear and another time striking him with a gun three times in his back and shoulder. On one occasion, police detained Haider for five hours, interrogated him about alleged terrorist connections, and struck him repeatedly in the back with a gun. Most disturbingly, three separate times Haider suffered sexual abuse and humiliation at the hands of the police, twice in public places. In the May 1996 incident, after stopping him on the street, officers pulled down his pants, put a gun "up in [his] butt," and taunted him, "how do you like that?" J.A. at 145. That summer, officers removed his clothes during an interrogation at the police station. And during the February/March 1997 incident, again in the street, an officer pulled down Haider's pants and prodded him in the buttocks "first . . . with his hands, then . . . with the big gun." J.A. at 153. After each episode, they threatened him with more of the same.

Even setting aside the incidents that could be viewed as retaliation for the filing of the lawsuit, we conclude that Haider experienced most of the actions listed in *Zacarias*. These abuses cannot be characterized as isolated incidents or mere verbal harassment, and the officers' questions about the GIA make clear that they specifically targeted him. The cases cited by the government and relied on by the BIA are distinguishable. In *Thanasi v. Gonzales*, 228 F. App'x 549, 554 (6th Cir. 2007) (unpublished opinion), the applicant suffered only "a single punch to the ribs, a slap to the face, an admittedly mistaken arrest, and momentary jostling and verbal harassment"—lower-level abuse to which the Haider's experiences cannot be reduced. In *Kane*, the allegations were serious—they included multiple beatings and detentions, one for two weeks—but the panel emphasized that the applicant had thrived academically and professionally and credited the IJ's finding of changed conditions in the country of origin. 236 F. App'x at 183-84. Finally, in *Mohammed v. Keisler*, 507 F.3d 369, 371-72 (6th Cir. 2007), the sum total of the abuse attributable to the government was a three-day detention, a slap, and a kick—again, conduct much less serious than that involved here.

In reaching a contrary conclusion, the IJ failed to analyze all the relevant facts and consider them in the aggregate. After suggesting that the internal bleeding in Haider's ear could have been caused by the flu, the IJ expressed surprise that Haider "only sustained the occasional bruise" as a result of his encounters with the police. J.A. at 82, 84. The IJ based his finding on the fact that Haider's injuries never required medical treatment and that he was "only detained one time for a total of five hours." *Id.* at 84. But the IJ neglected to discuss in his analysis section the repeated stops and searches, the theft of merchandise, or the variety of threats. Most egregiously, the IJ failed to consider the significance of the sexual humiliation that occurred on three occasions. This court has previously noted that abuse of this nature can make all the difference. In *Stenaj*, the panel distinguished its facts, which did not amount to persecution, from those in *Gilaj*, which did, in part on the basis that the applicant in *Gilaj* was molested by her persecutors. 227 F. App'x at 434;[10] *see also In re O-Z- & I-Z-*, 22 I. & N. Dec. at 25-26 (holding that Jewish boy was persecuted on account of his nationality in part based on "suffer[ing] extreme humiliation when he was forced to undress by his classmates"); *Kholyavskiy v. Mukasey*, 540 F.3d 555, 570 (7th Cir. 2008) (citing cases emphasizing the seriousness of being forced to expose one's private parts). These omissions make clear that the IJ failed to grasp the aggregate significance of Haider's encounters with the police. We hold that the IJ's characterization of the abuse as mere harassment was not supported by substantial evidence.[11]

---

[10]Importantly, the applicant in *Gilaj* did not spell out exactly what happened to her. She testified that during a search of her home, the police "started to provoke [her] as a woman," which the court characterized as a sexual assault or molestation, and possibly only an attempted one. 408 F.3d at 280, 286. Thus, *Gilaj* cannot be distinguished based on intensity of the violation.

[11]As an additional basis for affirmance, the government raises the IJ's expression of concern that Haider presented no statements from his family or doctor to corroborate his allegations. In some cases, the IJ uses the lack of corroborating evidence to support a credibility determination. *See, e.g.*, *Xue Rong Zheng v. Holder*, 315 F. App'x 570, 573-74 (6th Cir. 2009) (unpublished opinion) (applicant's failure to provide corroborating evidence "further supports the IJ's adverse credibility finding"). In others, the IJ invokes it as a separate basis to find that the applicant has not met his burden of proof. *See, e.g.*, *Yinggui Lin v. Holder*, 565 F.3d 971, 975, 977 (6th Cir. 2009) (applicant not incredible, but asylum denied for lack of corroborating evidence); *Dorosh v. Ashcroft*, 398 F.3d 379, 383 (6th Cir. 2004) (same); *Shkabari v. Gonzales*, 427 F.3d 324, 331-32 (6th Cir. 2005) (relief denied for lack of credibility and lack of corroboration). In this case, the IJ mentioned the lack of corroborating evidence as part of the credibility discussion, not as an independent basis for denial. Because the IJ did not rest his persecution decision on the lack of corroboration, it is no bar to reversal.

As discussed above, our conclusion that the allegations, if true, amount to past persecution requires us to remand to the BIA for a proper credibility determination. If, upon remand, the BIA credits Haider's testimony about the events reviewed here, the evidence compels a finding of past persecution and Haider is entitled to a presumption that his life or freedom would be threatened upon removal to Algeria. 8 C.F.R. § 208.16(b)(1)(i). The BIA should then consider whether the government can rebut the presumption, *id.*, and if so, whether Haider can prove the likelihood of future threat to life or freedom, *id.* § 208.16(b)(2).[12]

## D. Withholding of Removal Under the CAT

Under the Convention Against Torture, removal must be withheld if "it is more likely than not that [the applicant] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). No protected-ground nexus is required. *Almuhtaseb*, 453 F.3d at 751. Torture is "an extreme form of cruel and inhuman treatment." 8 C.F.R. § 1208.18(a)(2). Specifically, it is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted" to extract information, punish, intimidate, coerce, or otherwise discriminate, "when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* § 1208.18(a)(1).

The IJ's denial of relief under the CAT was supported by substantial evidence. The police abuse was not so severe as to constitute torture. *See Shkulaku-Purballori v. Mukasey*, 514 F.3d 499, 501, 503 (6th Cir. 2007) (multiple beatings, resulting in fainting and a broken finger, were not torture). The GIA, meanwhile, did not inflict physical harm on Haider, and he has not shown that their intimidation caused him extreme mental suffering. Nor did Haider prove that he could expect worse treatment upon his return.

---

[12] It is in this inquiry that the BIA can evaluate the significance of Haider's family's continued residence in Algeria and the fact that he reported no police harassment during his final years in that country. The abuse Haider claims to have experienced through 1997 constitutes past persecution. The argument that the police did not abuse him personally from late 1997 until his departure in 2000 may go to changed circumstances and the likelihood of future harm. In adjudicating those issues, the BIA should also consider Haider's testimony that he avoided the police during this time frame by moving between relatives' homes. We note that the statement that Haider claims that police made to his mother in 1999—"where is your son, we haven't seen him," J.A. at 173—is consistent with his explanation.

### III. CONCLUSION

Assuming Haider's testimony to be credible, we hold that the evidence compels a finding that the police abused Haider based on an imputed political opinion, namely, his suspected affiliation with the GIA. Our assumption of Haider's credibility, however, was just that—an assumption. As the IJ expressed some concern about the reliability of his testimony, the case must be returned to the BIA to permit factfinding along these lines. We therefore **GRANT** the petition as to withholding of removal under the INA and **REMAND** for proceedings consistent with this opinion. We also conclude that neither the actions of the Algerian police nor those of the GIA amounted to torture. Accordingly, we **DENY** the petition with respect to withholding of removal under the CAT.

———————————————

**DISSENT**

———————————————

BOGGS, Circuit Judge, dissenting.  I concur with the majority's well-reasoned discussion of the "preliminary issues" raised by the petitioner in this case.  I believe that, despite the BIA's imprecise articulation of the proper standard of review, it ultimately applied de novo review to the evidence before it.  Moreover, I believe that it makes good sense in this case to assume the petitioner's testimony to have been credible, because none of the petitioner's allegations with respect to facts undergirding the dispositive issues appear to have been discounted by the IJ or the BIA.

I write separately, however, to express my disagreement with the majority's belief that it is compelled to conclude that the Algerian police's actions in this case were motivated by Mohamed Haider's imputed political opinions.  Whereas the majority would hold that "suspected affiliation with an anti-government terrorist group constitute[s] imputed political opinion," I find such a conclusion unsupportable.

We are required to give "deference to the BIA's reasonable interpretation of the statutes and regulations" it enforces.  *Lin v. Holder*, 565 F.3d 971, 976 (6th Cir. 2009) (citing *Chevron v. Natural Res. Def. Council*, 467 U.S. 837, 843–44 (1984)).  While the BIA does not appear to have addressed itself to the precise question at hand, it is instructive to note that it has held that "persecution . . . clearly contemplates that harm or suffering must be inflicted upon an individual in order to punish  him for possessing a belief or characteristic a persecutor seeks to overcome."  *In re Acosta*, 19 I. & N. Dec. 211, 223 (BIA 1985), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987).  Such a "belief or characteristic" is clearly distinguishable from the *action* of committing or aiding acts of murder and mayhem.  Those acts do not automatically become expressions of "political opinion" when they are committed by groups with political aims.

Furthermore, "refuge is restricted to individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution."

*Acosta*, 19 I. & N. Dec. at 234.  Thus, the INA provides refuge for those persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion only to the extent that these beliefs or characteristics are beyond the control of the applicant or are of the kind that we believe "as a matter of conscience" that a petitioner ought not be required to change to avoid persecution.

Is affiliation with a terrorist group a "belief?"  One cannot reasonably contend so.  A terrorist group, as the name implies, is not defined by the political opinions it espouses but by its methods.  Is it a "characteristic?"  Perhaps, if one views a tendency to resort to violence as a political weapon as a "characteristic," but in no event could such a tendency be described as one that a petitioner could not change, or should not be required to change.  As the record in this case indicates, the GIA and its splinter groups were involved in active terrorist campaigns that targeted civilians; during the 1990s, they were part of a wave of terrorism that took the lives of more than 100,000 Algerians.  The GIA's methods were calculated to achieve its aims not through political discourse of the kind we should protect "as a matter of conscience," but through indiscriminate violence and threats of violence designed to cause widespread chaos and fear that might permit them to bully their way into power.

The actions of the Algerian police, of course, may have been no better in this case than those of their enemies.  If Mr. Haider's testimony is to be believed, their humiliating attacks on him with little or no evidence of his connection to the GIA deserve to be condemned.  While one may sympathize with Mr. Haider's plight, however, victimization by arbitrary thuggishness is decidedly not a protected ground, and there is simply no evidence that the police abused him on account of his imputed political opinion, as opposed to their belief that he was affiliated with a group that—regardless of its politics—engaged in the murder of civilians in a quest for power.

The majority anticipates this argument in its footnote 9, but does not provide a convincing reply.  In claiming that a distinction between political opinion and conduct "would be in tension" with case law, it points to one unpublished decision of this circuit (*Abdulnoor v. Ashcroft*, 107 F. App'x 594 (6th Cir. 2004)), a decision of the Ninth

Circuit (*Kumar v. Gonzales*, 444 F.3d 1043 (9th Cir. 2006)), and a decision of the Second Circuit (*Uwais v. United States Attorney General*, 478 F.3d 513 (2d Cir. 2007)). The decision in *Abdulnoor*, however, gives no indication whatsoever that the petitioner in the case was persecuted for his *methods*; while the Iraqi government linked him to an opposition group because weapons for which he was responsible ended up in that group's hands, there is no evidence that Abdulnoor would not have been under the same threat if the group had been engaged in peaceful resistance. *See Abdulnoor*, 107 F. App'x at 595. Given the situation in Iraq under Saddam Hussein, it is quite likely that *any* form of political opposition could have resulted in the sentence of death Abdulnoor found himself under, and the court certainly does not tell us differently. Thus, *Abdulnoor* cannot fairly be read to bar a distinction between a petitioner's opinions and his conduct. To the extent that *Kumar* or *Uwais* may be read to hold differently, I disagree with them, though I note that the support they provide for the majority is shaky at best. The cited portion of *Kumar* addresses itself to the question of whether the petitioner's imputed political opinion *was sufficient to provide a nexus*, and does not at all concern the opinion/method distinction. *Kumar*, 444 F.3d at 1053–54. *Uwais* involved a petitioner who was persecuted in large part because of her Tamil ethnicity and not just her alleged involvement with the group known as the Tamil Tigers—an important point because the court was reviewing a BIA finding that the persecution had not been even *partly* motivated by a protected ground, *Uwais*, 478 F.3d at 518, and the court in that case thus had no occasion to discuss the core argument here.

Curiously, the majority concludes that "[e]ven if the conduct–opinion distinction were appropriate in some cases, it has no application here. The BIA explicitly found that the police abused Haider 'because they believed that he was associated with the GIA'—i.e., because of his imputed membership with a political organization." This simply begs the question, however; whether Haider's association with the GIA was, in the police's eyes, an association with a *political* organization is precisely the issue under discussion. I find that a review of the evidence in this case produces sincere doubt as to that question, given that the Algerian police are not described as calling Haider a

"dissident" or an "activist," but rather, as the majority notes, a "terrorist."[1] In ushering Haider through the golden door, the majority sets a dangerous precedent.

Accordingly, I respectfully dissent.[2]

---

[1] While the majority is doubtless correct that such a term *can* "carry a political valence," Majority Opinion at 13 n.9, there is no evidence in this case that it *did*. The very State Department report cited by the majority states that the GIA "launched *terrorist* campaigns against government figures and institutions *to protest* the banning of the Islamist parties." *Ibid.* (emphases added). There is no suggestion in the record that Haider was singled out because the GIA "protest[ed] the banning of the Islamist parties" rather than because it "launched terrorist campaigns." Of course terrorism can be in aid of political goals—it usually is. When Josef Stalin masterminded bank robberies that left dozens dead, he did so to fund Lenin's nascent Bolshevik Party. *See* Simon Sebag Montefiore, *Young Stalin* 3–16 (Vintage Books 2008). When the Russian government sought to bring him to justice for those crimes, must we believe it did so on account of his political opinions, rather than because he was a murderer and a thief?

[2] Because I believe that the evidence does not compel the conclusion that Haider was abused on account of a protected ground, I would not reach the question of whether those abuses constituted "persecution," and I express no opinion on that matter.