NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0030n.06

No. 09-3980

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

NIKOLAY FRANTS SHVEDKO; and MARIKA
AVGUSTIN SVEDKO,

     Petitioners,

v.

ERIC H. HOLDER, JR., Attorney General,

    Respondent.

ON PETITION FOR REVIEW OF AN
ORDER OF THE BOARD OF
IMMIGRATION APPEALS

_____/

Before:     BATCHELDER, Chief Judge; MARTIN and SUTTON, Circuit Judges.

BOYCE F. MARTIN, JR., Circuit Judge. Petitioners Nikolay Shvedko and Marika Svedko[1]

filed affirmative[2] petitions for asylum, withholding of removal pursuant to section 241(b)(3) of the

Immigration and Nationality Act, and protection under the Convention Against Torture.[3] An

immigration judge denied their applications, and the denials were affirmed by the Board of

Immigration Appeals. Nikolay and Marika now appeal the Board's denial of their withholding

section 241(b)(3) and Convention claims.[4] We **DENY** Nikolay's and Marika's petitions for review.

---

[1] Because of the confusing similarity of Petitioners' last names, they are referred to throughout this opinion by their first names.

[2] Withholding proceedings had not yet been initiated against Nikolay or Marika.

[3] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, p. 20, 1465 U.N.T.S. 85; *see* 8 C.F.R. §§ 1208.16-.18 (2010).

[4] Marika does not appeal her asylum claim even though it was timely filed and she would meet a lesser burden than with her withholding claims.

## I. BACKGROUND

Nikolay was born in Soviet Russia, but moved at age eight to Estonia, another Soviet Union member state. Marika was born in Estonia, where she and Nikolay met, married, and had two children. After serving in the Soviet Army, Nikolay became a member of the KGB to investigate criminal cases in Estonia. Unhappy as a KGB agent, Nikolay requested to be discharged from the agency. That request was denied and viewed almost as a treasonous act. Nevertheless, Nikolay again requested a discharge in 1990 and was granted walking papers.

When Estonia became an independent nation in 1991, Marika and the two children automatically became citizens of the new Republic of Estonia because they were all born there. Nikolay, however, did not automatically qualify for citizenship because he was born in Russia, and never achieved full citizenship. Instead, he received multiple temporary permits allowing him to reside in Estonia, but not to work there, and he obtained a passport from the new Russian Federation.

Nikolay began commuting to Russia for small jobs after leaving the KGB, but sometime near the beginning of 1997, he accepted a position with the Estonian secret police, who contacted him because of his old KGB position. He continued working with the secret police until early 1999 when he began working in Russia for a man exporting lumber from there to Estonia.

In 2002, Nikolay arrived in the United States and has remained here since. Marika joined him in 2004. Their children, then sixteen and eighteen, remained in Estonia living in the family apartment. In 2004, after both Nikolay's and Marika's departure times had passed, they filed affirmative petitions with the Department of Homeland Security for asylum, withholding of removal, and protection under the Convention claiming that they feared future persecution and torture at the

hands of the Estonian and Russian secret police. Their petitions were referred to an immigration judge, who found Nikolay and Marika to be credible, but denied their petitions on grounds that Nikolay's was untimely, neither established past persecution, and neither established beyond speculation that they would be persecuted or tortured when removed. The immigration judge ordered Nikolay removed to Russia or alternatively to Estonia and Marika to Estonia. They appealed the decisions to the Board of Immigration Appeals, but the Board denied their appeals, finding that the immigration judge's decisions were not clearly erroneous.

## II. DISCUSSION

Nikolay and Marika assert that, if returned to their countries of removal, they would be persecuted and tortured because Nikolay's past affiliations with the KGB and Estonian secret police place them in persecuted social groups, and because membership in those groups imputes to them certain political opinions. Also, they cite human rights problems and police and prison brutality in both countries as further evidence. However, a series of events occurring between 1992 and 2004 constitute the bulk of reasons that they fear future persecution and torture.

The first event occurred sometime between 1992 and 1995 when Marika found crosses affixed to their apartment with the initials "KGB" and their names written on them. She also suspected that she was being followed, but she does not allege by whom. Additionally, a local daycare refused to admit their son, hinting that the reason was the family's former Soviet affiliation.

When Nikolay began working with the Estonian secret police around 1997, Nikolay believes that their apartment was under audio and video surveillance because bushes and trees were cut down in front of the apartment. Additionally, an Estonian secret police agent named Marko Reinhardt

contacted the home and knew information that only could have been obtained from listening to family conversations inside the apartment. Also, former KGB contacts began visiting the family without invitation.

A few years later, former KGB agents contacted Nikolay asking to be put in contact with his employer. Shortly thereafter, in 2002, his employer told him that agents from the new Russian Federal Security Bureau had come to his office wanting to "detain" Nikolay in order to "clarify" some things. Afraid for his safety, Nikolay fled Russia and came to the United States in 2002.

The last events cited by Nikolay and Marika occurred around 2004 after Marika had come to the United States. While the children lived alone in the apartment, Reinhardt contacted them multiple times looking for Nikolay and knew things about them "from their recent past." Nikolay telephoned Reinhardt from the United States at which time Reinhardt told him that Nikolay would be back in Estonia within a year and that Reinhardt would know about it and be in touch with him.

A.      **Standard of Review**

We have jurisdiction to review final orders of removal issued by the Board. *See* 8 U.S.C. § 1252(a) (2006); *Urbina-Mejia v. Holder*, 597 F.3d 360, 364 (6th Cir. 2010). When the Board's decision "adopts the immigration judge's reasoning and supplements [it]," as the Board did here, we review that opinion as supplemented. *Urbina-Mejia*, 597 F.3d at 364 (citing *Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009)).

This Court reviews questions of law de novo, but factual findings by the Board and the immigration judge are reviewed for "substantial evidence." *Shaya v. Holder*, 586 F.3d 401, 405 (6th

Cir. 2009). "These findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

**B.      Withholding of Removal**

Withholding of removal pursuant to section 241(b)(3) of the Immigration and Nationality Act "is not discretionary, but rather is mandatory if the alien establishes that his 'life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Urbina-Mejia*, 597 F.3d at 364-65 (quoting *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009)). To satisfy this burden, the applicant must establish a "clear probability" that he will be persecuted upon return to the country of removal. *Id.* at 365 (quoting *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005)). An applicant may establish a threat of persecution by showing past persecution on a protected ground or that there is more likely than not a future threat of persecution on a protected ground. 8 C.F.R. § 1208.16(b) (2010); *see Thap v. Mukasey*, 544 F.3d 674, 681 (6th Cir. 2008). Persecution is "'the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim.'" *Urbina-Mejia*, 597 F.3d at 365 (quoting *Khalili*, 557 F.3d at 436)**.**

Importantly for purposes of section 241(b)(3), Nikolay and Marika do not allege past persecution. Therefore, to establish eligibility for withholding of removal pursuant to section 241(b)(3), they must show that it is more likely than not that they would suffer future persecution if returned to their countries of removal. Although Nikolay and Marika do not allege that the events

they experienced in the past were "past persecution," those events still form much of the basis for their fear of future persecution.

Nikolay believes that he will persecuted by the Russian secret police if returned to Russia, but out of all the past events he cites as reasons supporting his fear, the only one that is relevant to the Russian secret police is the time that they attempted to "detain" him at work to "clarify" some things. Even though he worked in Russia for approximately three years from the time he stopped working with the Estonian police until he fled to the United States, this is the lone event from that time period to which he points as proof that he will be persecuted in the future. Since that single instance in 2002, the Russian secret police have not attempted to contact him or his family. Additionally, Nikolay does not know what the police wanted, much less whether they intended to harm him. Even though he "guesses" that they are concerned with his past involvement with the Estonian secret police, he admits that his work did not conflict with Russian interests.

The only other bases that Nikolay cites for this fear are country reports stating that Russia has problems with human rights as well as police and prison brutality. However, "'feared persecution must relate to the alien individually, not to the population generally.'" *Harchenko v. I.N.S.*, 379 F.3d 405, 410 (6th Cir. 2004) (citation omitted). These alleged problems have nothing to do with his individualized status as a former member of the KGB and Estonian secret police. Therefore, Nikolay has failed to establish that it is more likely than not that he would be persecuted if returned to Russia.

Nikolay's and Marika's fear of persecution upon returning to Estonia is based upon the remainder of the past events, but they are less compelling. Nikolay and Marika cite evidence of

inscribed crosses attached to their apartment, Marika's belief that she was followed, Nikolay's belief that their apartment was under surveillance, phone calls from the Estonian secret police looking for Nikolay, Reinhardt's assertion that he would know when Nikolay was in Estonia and would be in touch with him then, and a daycare's refusal to admit their son. To be sure, it would be undesirable and unfortunate for Nikolay and Marika to return to Estonia and experience similar events. However, assuming those types of events would continue, they would more closely resemble harassment than persecution. *Cf. Haider v. Holder*, 595 F.3d 276, 289 (6th Cir. 2010) (quoting *Mikhailevitch v. I.N.S.*, 146 F.3d 384, 390 (6th Cir. 1998)) ("Persecution 'requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty.'"). Furthermore, the nature of these events does not indicate that any future events would escalate to persecution. What is more, Nikolay's and Marika's children have continued to reside in the family apartment without being harmed since their parents came to the United States. This fact undercuts Nikolay's and Marika's fear of persecution. *See In re A-E-M*, 21 I. & N. Dec. 1157, 1160 (BIA 1998) (noting that the applicant's fear of persecution was undercut by the fact that his family members remained in Peru unharmed for four years after he left).

Nikolay and Marika also cite country reports identifying Estonia as a place where human rights problems and police and prison brutality occur, but as with Russia, this generalized evidence does not relate to them. *See Harchenko*, 379 F.3d at 410. Therefore, Nikolay and Marika have failed to establish that it is more likely than not that they would be persecuted if returned to Estonia.

**C.    Convention Against Torture**

Eligibility for withholding of removal under the Convention Against Torture requires the applicant "to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 208.16(c)(2); *see Shkulaku-Purballori v. Mukasey*, 514 F.3d 499, 503 (6th Cir. 2007).  Torture is defined as "'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted' to extract information, punish, intimidate, coerce, or otherwise discriminate." *Haider*, 595 F.3d at 289 (quoting 8 C.F.R. § 1208.18(a)(1)). Relief under the Convention is quite similar to withholding of removal under section 241(b)(3), but does not require the applicant to link the harm that he will face with any of the five protected grounds for asylum—race, religion, nationality, membership in a particular social group, or political opinion.  *See Castellano-Chacon v. I.N.S.*, 341 F.3d 533, 551-52 (6th Cir. 2003).

Nikolay and Marika base their claims for withholding pursuant to the Convention on the same evidence cited for their section 241(b)(3) claims.  However, because they have failed to establish that it is more likely than not that they would suffer persecution, they have neither established that they would more likely than not be tortured. *Compare Thap*, 544 F.3d at 681 (definition of persecution), *with Haider*, 595 F.3d at 289 (definition of torture).

## IV.  CONCLUSION

For the foregoing reasons, we **DENY** Nikolay's and Marika's petitions for review.